UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v.                                            )<br>)<br>ALVIN HARDY,                          )<br>)<br>        Defendant             ) | Mag. No. 09-72-P-JHR |

### MEMORANDUM DECISION ON PROBABLE CAUSE

Alvin Hardy, charged in a criminal complaint with violating 18 U.S.C. § 871(a), Criminal Complaint (Docket No. 3),[1] appeared before me, represented by counsel, on July 24, 2009, for a preliminary examination, at which he contended that probable cause to support the charge is lacking for two reasons. First, he asserts, the only evidence of a possible violation of the statute at issue comes from evidence that is barred by the psychotherapist-patient privilege, and second, that the evidence against him could not be construed to demonstrate any reasonable expectation that the statement at issue was a "true threat." I conclude that, given the relatively low legal threshold required to establish probable cause, the government has met its evidentiary burden.

### I. Applicable Legal Standards

The statute here at issue provides, in relevant part:

>   (a) Whoever knowingly and willfully deposits for conveyance in the mail . . . any letter . . . or document containing any threat to take the life of, to kidnap, or to inflict bodily harm upon the President of the United States . . . or knowingly and willfully otherwise makes any such threat against the President . . .  shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 871(a).

---

[1] The complaint was sealed when it was filed, Docket Nos. 1-3, but has since been unsealed, Docket No. 9.

Fed. R. Crim. P. 5.1 provides, in pertinent part:

> If a defendant is charged with an offense other than a petty offense, a magistrate judge must conduct a preliminary hearing[.]
>
> * * *
>
> At the preliminary hearing, the defendant may cross-examine adverse witnesses and may introduce evidence but may not object to evidence on the ground that it was unlawfully acquired. If the magistrate judge finds probable cause to believe an offense has been committed and the defendant committed it, the magistrate judge must promptly require the defendant to appear for further proceedings.

Fed. R. Crim. P. 5.1(a) & (e).

In order to establish probable cause for the purposes of Rule 5.1, the government need only present sufficient evidence "to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief in the guilt of the accused." *In re Lam*, 2009 WL 1313242 (E.D. Cal. May 12, 2009), at *6. In making this determination, the court engages in a "totality-of-the-circumstances analysis." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Probable cause may be based on a "fair probability" that the defendant committed the offense charged. *Id*. at 238.

## II.  Factual Background

The following facts are taken from the testimony of U. S. Secret Service Special Agent Martin Conley at the preliminary hearing, where he was the only witness, and from the complaint, which was sworn to by Agent Conley (Docket No. 3).[2]

The defendant, who has a history of mental illness and a criminal history that includes convictions for criminal trespass and battery, malicious entry, and felonious assault (involving firing shots at a security guard at a public library), and who is reported to have threatened the life

---

[2] I do not rely in any way on the purported "correction" of paragraph 9 of the complaint by the unsworn post-hearing submission by the government (Docket No. 16). Similarly, due to the questions raised by that document, I do not rely on paragraph 9 of the complaint. To the extent that Agent Conley's testimony at the hearing addressed the substance of matters set forth in paragraph 9 of the complaint, however, I do rely on his testimony.

of Bishop Anthony Pilla in Cleveland, Ohio, appeared at the emergency room of Maine Medical Center late at night on May 10, 2008, complaining of either high blood pressure or a blood sugar issue.  While being admitted, the defendant threatened to cut someone's head off.  A security guard searched him and recovered a large hunting knife.

During their initial medical assessment of the defendant, one or more employees of the hospital heard the defendant threaten to kill then-President Bush by cutting his head off and by shooting him.  One of the hospital's employees called the Secret Service to inform them of this threat.  The defendant was then transferred to Spring Harbor Hospital for further psychiatric evaluation.

On May 11, 2008, Agent Conley spoke with a nurse at Spring Harbor, who informed him that the defendant had been overheard making threats about President Bush, the pope, Senator John McCain, and hospital staff.  When Agent Conley spoke later with other employees of Spring Harbor, they told him that the defendant had said that he was going to Washington, D.C., to cut these people's heads off and to shoot them.  Agent Conley spoke with the defendant's treating psychiatrist at Spring Harbor at this time and, after the defendant signed a release, reviewed the defendant's medical file.  The treating psychiatrist confirmed that the defendant had told her that he was going to kill President Bush, President Bush's father, and Senator McCain.

The defendant's treating psychiatrist initiated proceedings to commit him involuntarily for psychiatric treatment on the basis that he was a threat to others, due to the threats that he had made.  The defendant was involuntarily committed.

Agent Conley interviewed the defendant on May 11, 2008, at Spring Harbor.  He told Agent Conley that the two Presidents Bush and other government officials "sought his demise."  He said that he had acquired a hunting knife in Lewiston, Maine, recently and had tried to

acquire a firearm but was unsuccessful because he did not have a valid Maine identification card. He said that he planned to go to Washington, D.C. upon his release from Spring Harbor.

On May 21, 2008, Spring Harbor personnel informed the defendant that they were planning to release him due to what they believed to be his stabilized condition. The defendant became agitated and began to threaten staff members. He was overheard using the telephone to obtain the telephone number for a gun shop. He told his treating psychiatrist that he had done so in order to obtain a bullet-proof vest. Spring Harbor personnel then reinitiated the involuntary commitment process, and the defendant's further commitment was authorized by a state court judge.

On May 30, 2008, the defendant was transferred to Riverview Hospital in Augusta, Maine, for further treatment. On June 16, 2008, he was discharged from that facility and placed on a bus to Cleveland, Ohio. Shortly after his arrival in Ohio, the defendant was hospitalized at Northcoast Behavioral Health Center. On January 29, 2009, he was discharged to a supervised group home, where he stayed only a few hours. The defendant left his medication and most of his clothing behind.

On June 3, 2009, Agent Conley filed the complaint in this matter and a warrant for the defendant's arrest issued. Docket Nos. 3-6. The defendant was arrested in Minnesota on or about June 25, 2009. Docket. That day, in the district of Minnesota, the defendant had his initial appearance pursuant to Fed. R. Crim. P. 5(c)(3). Docket No. 10. On June 29, 2009, he had a detention hearing, also in the District of Minnesota, and was ordered detained on July 2. Docket No. 11. The defendant reserved his right to a preliminary hearing in the District of Maine. *Id.*

### III.  Discussion

#### A.  Psychotherapist-Patient Privilege

In *Jaffee v. Redmond*, 518 U.S. 1 (1996), the Supreme Court recognized a privilege under federal law protecting confidential communications between a psychotherapist and his or her patient.  It held "that confidential communications between a licensed psychotherapist and her patients in the course of diagnosis or treatment are protected from compelled disclosure under Rule 501 of the Federal Rules of Evidence."  *Id*. at 15.  It noted that the protection of the privilege may be waived by the patient, *id.* n.14, and that "we do not doubt that there are situations in which the privilege must give way, for example, if a serious threat of harm to the patient or to others can be averted only by means of a disclosure by the therapist."  *Id*. at 18 n.19.

Counsel for the defendant contended at the hearing that this privilege barred any evidence of the statements made by the defendant during his time at Maine Medical Center or Spring Harbor Hospital in May 2008.  Counsel for the government responded that only statements made for the purpose of diagnosis are protected, and that the defendant's threats against the then-president were not necessary to any diagnosis.  In the alternative, he pointed to the above statement in footnote 14 of the *Jaffee* opinion and asserted that this case is one in which the privilege must give way.

The government cabins the privilege too narrowly.  In *Jaffee,* the Supreme Court described the newly-recognized privilege as applying to confidential communications between psychotherapist and patient "in the course of diagnosis or treatment."  From all that appears, the defendant's threats to kill the then-president were made to mental health professionals in the course of his diagnosis and/or treatment.  That is all that is necessary for invocation of the privilege.  Thus, I reject the government's first argument.

The government's second argument merits further consideration. In *United States v. Glass*, 133 F.3d 1356 (10th Cir. 1998), a widely-cited opinion, the Tenth Circuit was presented with an invocation of the psychotherapist-patient privilege by a defendant who was charged, like the defendant here, with violation of 18 U.S.C. § 871(a). *Id*. at 1357. That defendant, under voluntary hospitalization for treatment of mental illness, told his psychotherapist that he "wanted to get in the history books like Hinkley [sic] and wanted to shoot Bill Clinton and Hilary [sic]." *Id*. Clinton was president of the United States at the time. Glass was released several days later upon his agreement to participate in outpatient treatment while residing with his father. *Id*. Ten days later, an outpatient nurse discovered that Glass had left his father's home and contacted law enforcement, who in turn contacted the psychotherapist who then related Glass's threat. *Id*.

Glass moved to exclude the psychotherapist's statement on the basis of the privilege. *Id*. There was no evidence to the effect that the psychotherapist believed that Glass presented a danger of violence to the president. *Id*. n.2. After reviewing *Jaffee*, the Tenth Circuit observed that "[w]hen the statement was made, the treating psychiatrist did not contact authorities" but "instead proposed a course of treatment[.]" *Id*. at 1359. That course of treatment included discharging Glass from hospital supervision. *Id*. Ten days elapsed before the Secret Service was contacted. *Id*.

The Tenth Circuit "fail[ed] to see how this situation differs from that protected in *Jaffee*." *Id*. Accordingly, it held that the privilege protected Glass's statements and that the trial court was required to determine "whether, in the context of this case, the threat was serious when it was uttered and whether its disclosure was the only means of averting harm to the President when the disclosure was made. In particular, the court will want to hear [the treating

6

psychiatrist's] opinion of the seriousness of the threat as well as the opinion of any appropriate authority who deals with the protection of the President." *Id*. at 1360.

In *United States v. Hayes*, 227 F.3d 578 (6th Cir. 2000), the Sixth Circuit discussed and rejected the Tenth Circuit's rationale in *Glass*, concluding that there should be no "dangerous patient" exception to the privilege. *Id*. at 582-86. The charge in that case was based on the defendant's threat to kill his supervisor at the United States Postal Service. *Id*. at 579-80.

The First Circuit has not spoken to this issue. In this case, to begin with, an argument could be made that the defendant waived the privilege by signing a release that allowed Agent Conley to read the medical records of his relevant hospitalizations, which Conley testified included a record of the defendant's threats against the president made to his treating psychotherapist at Spring Harbor.[3] However, the Secret Service would not have had cause to request the release had it not been informed by an employee of Maine Medical Center about the plaintiff's threat to the life of the president. Accordingly, the release is not dispositive, and I address the privilege issue directly.

This case may be distinguished from the holding of the *Glass* court, whose rationale I find more persuasive than that of the *Hayes* court, particularly given the Supreme Court's footnote in *Jaffee* suggesting that the privilege must give way to a serious threat of harm. Here, an individual presumably involved in the defendant's treatment at Maine Medical Center immediately informed the Secret Service of the threat, thereby evidencing that the threat was taken seriously by the defendant's caregivers, contrary to the 10-day delay in *Glass*. On the other hand, the Secret Service and the government prosecutors did not seek to arrest the

---

[3] In *United States v. Crews*, 781 F.2d 826 (10th Cir. 1986), which also involved a charge under 18 U.S.C. § 871(a), the defendant's open discussion with a Secret Service agent, following a *Miranda* warning, of the threat that had been reported by the nurse to whom it had been made was held to waive the privilege. *Id*. at 831. In the case at hand, Agent Conley did not testify, or report in the complaint, that the defendant either admitted or repeated to him the threat for which he is charged.

defendant on this charge until over five months after he left the supervised group home,[4] suggesting that the threat was not viewed, at least by them, to be serious or its danger imminent. Still, I conclude on balance that the "dangerous defendant" exception to the privilege should apply in this case. The evidence of the threat need not be excluded based on the psychotherapist-patient privilege.

### B. "True Threat"

The defendant's second argument is that the circumstances surrounding the reported threat do not allow it to be considered a "true threat," and the charge must therefore be dismissed because sufficient evidence "to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief in the guilt of the accused" has not been presented. *In re Lam*, 2009 WL 1313242 at *6.

On this point, counsel for the defendant cited *Watts v. United States*, 394 U.S. 705 (1969), and *Virginia v. Black*, 538 U.S. 343 (2003), contending that *Watts* establishes that the threat must be a "true threat" in order to be actionable under 18 U.S.C. § 781(a) and that *Black* reaffirms the holding in *Watts* that the government cannot restrict expression "simply because a vast majority of its citizens believe the expression to be false and fraught with evil consequences." Hearing Transcript at 39. It seems to me that the latter argument requires that the defendant's statements concerning President Bush have constituted some form of political expression. I reject that characterization. The reported statements were pure, unqualified threats to kill the president, which cannot constitute constitutionally-protected speech.

This distinction is made clear in *Watts*. In that case, the defendant was prosecuted under section 871(a) for making the following statement at a political rally:

---

[4] There is no evidence of the date on which the Secret Service became aware that the defendant had decamped or about its efforts to remain assured that the defendant was not free in the community after he was discharged from Riverview.

> [N]ow I have already received my draft classification as 1-A and I have got to report for my physical this Monday coming. I am not going. If they ever make me carry a rifle the first man I want to get in my sights is L.B.J. They are not going to make me kill my black brothers.

394 U.S. at 706. Holding that "the statute initially requires the Government to prove a true 'threat,'" the Court said that "the kind of political hyperbole indulged in by petitioner [does not] fit[] within that statutory term." *Id*. at 708. The Court agreed with the petitioner that his statement was

> a kind of very crude offensive method of stating a political opposition to the President. Taken in context, and regarding the expressly conditional nature of the statement and the reaction of the listeners [laughter], we do not see how it could be interpreted otherwise.

*Id*. (internal quotation marks omitted).

*Black*, a case involving a conviction for attempted cross-burning with intent to intimidate under a state statute, provides some expansion on the holding in *Watts* as follows:

> "True threats" encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual[.] The speaker need not actually intend to carry out the threat.

538 U.S. at 359-60 (citing *Watts*; other citations omitted). From all that appears in this case, the defendant meant to communicate a serious expression of his intent to kill the president, an act of unlawful violence, at the time he made the statements. Those statements, as reported, cannot reasonably be construed as "political hyperbole."

Counsel for the defendant also cited *United States v. Fulmer*, 108 F.3d 1486 (1st Cir. 1997), to suggest that the First Circuit would require proof of intent that is not present in the case at hand and that a defendant may only be convicted under section 871(a) if it is shown that he should reasonably have foreseen that his statement would be taken as a threat by those to whom it was made. *Fulmer* involved a prosecution under 18 U.S.C. § 115(a) for threatening a special

9

agent with the FBI. *Id*. at 1489. If the latter standard is to be applied in this case involving a charge of threatening to kill the president under section 871(a), I "cannot say that no rational jury could [find] beyond a reasonable doubt that [the defendant's] statement was a threat." *Id*. at 1492. *See generally United States v. Kosma*, 951 F.2d 549, 554-55 (3d Cir. 1991), and cases cited therein.

With respect to the first point, as I understand it, the *Fulmer* court stated that, under 18 U.S.C. § 115(a), "[t]he only intent requirement is that the defendant intentionally or knowingly communicates his threat, not that he intended or was able to carry out his threat." 108 F.3d at 1494 (citation and internal punctuation omitted). *See also United States v. Dixon,* 449 F.3d 194, 202 (1st Cir. 2006) (citing with approval *United States v. Lincoln*, 462 F.2d 1368, 1369 (6th Cir. 1972) for proposition that 18 U.S.C. § 871(a) does not require that threat be uttered with willful intent to carry it out). If that standard is likewise to be imported into section 871(a), I have no difficulty concluding, on the showing made, that the defendant knowingly and intentionally communicated his threats against the then-president to the mental health professionals at Maine Medical Center and Spring Harbor. For purposes of determining probable cause to believe that the defendant committed the offense charged, it is irrelevant that the defendant was in no position to be able to carry out his threat at the time it was made. *See generally United States v. Miller*, 115 F.3d 361, 363 (6th Cir. 1997) (fact that author was in prison does not transmute threatening letter into innocuous prank); *United States v. Lewis*, 313 Fed.Appx. 703, 706-7, 2009 WL 577657 (5th Cir. Mar. 6, 2009), at **3 ("knowing and intentional" element of statute addresses the communication of the threat, not intent or ability to carry it out).

## IV.  Conclusion

For the foregoing reasons, I conclude, under the totality of the circumstances shown, that the government has demonstrated probable cause to believe that the defendant committed the crime with which he is charged in the complaint.

Dated this 30th day of July, 2009.

                                                /s/  John H. Rich III
                                                John H. Rich III
                                                United States Magistrate Judge